## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | |
|---|---|
| JEFFREY JUSTICE, Derivatively on Behalf of Nominal Defendant BIGBEAR.AI HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEVIN MCALEENAN, PETER CANNITO, SEAN BATTLE, PAMELA BRADEN, PAUL FULCHINO, JEFFREY HART, DOROTHY D. HAYES, KIRK KONERT, AMANDA LONG, LOUIS R. BROTHERS, RALUCA DINU, RAANAN I. HOROWITZ, AVI KATZ, JULIE A. PEFFER, and JOSHUA KINLEY, <br><br> Defendants, <br><br> and <br><br> BIGBEAR.AI HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. 1:25-cv-710 <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jeffrey Justice ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant BigBear.ai Holdings, Inc. ("BigBear" or the "Company"), against certain of the Company's executive officers (the "Officer Defendants"), BigBear's board of directors (the "Board"), and certain of the Company's former directors (the "Former Director Defendants" and, collectively, the "Individual Defendants") for breaches of fiduciary duties and violations of federal law. Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted

by his counsel, including review of publicly available information regarding the Company; the allegations of a class action complaint filed in the Securities Class Action captioned *Priewe v. BigBear.ai Holdings, Inc. et al.,* Case No. 1:25-cv-00623-PTG-WEF (E.D. Va. Apr. 11, 2025); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by BigBear; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of BigBear against the Individual Defendants (fully defined below) for breaches of their fiduciary duties between at least March 31, 2022 and March 25, 2025, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential class-wide liability in the Securities Class Action, as well as significant costs to: defend itself in the Securities Class Action, restate the Company's audited consolidated financial statements since fiscal year 2021, and remediate BigBear's inadequate internal controls over financial reporting, as set forth below.

2.      BigBear is a technology company specializing in artificial intelligence and data analytics. The Company provides solutions to enhance decision-making and operational efficiency in various operations, including supply chain management, national security, and biometrics.

3.      In December 2021, BigBear went public via a merger with a special purpose acquisition company called GigCapital4, Inc (the "Merger"). Upon completion of the Merger, BigBear issued $200 million of unsecured convertible notes due to mature on December 15, 2026

(the "2026 Convertible Notes" or the "2026 Notes"). The 2026 Convertible Notes bear interest at a rate of 6.0% per annum, payable semi-annually, not including any interest payments that are settled with the issuance of shares, and were convertible into 17,391,304 shares of the Company's common stock at an initial Conversion Price of $11.50.

4.      Convertible notes typically constitute long-term debt. Accordingly, pursuant to generally accepted accounting principles ("GAAP"), convertible notes are required to be accounted for in quarterly and annual reports as liabilities until they reach maturity, at which point they either convert to equity or are repaid as principal and interest.

5.      BigBear uses the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") to account "for all transactions and events in which it obtains control over one or more other businesses (even if less than 100% ownership is acquired), to recognize the fair value of all assets and liabilities assumed and to establish the acquisition date fair value as of the measurement date." As such, BigBear was required to account for the Merger, and the accompanying issuance of the 2026 Convertible Notes, in accordance with the ASC.

6.      Pursuant to ASC 815-15, an entity must bifurcate and separately account for a derivative embedded within a host contract (such as the conversion option within the 2026 Convertible Notes) if: (1) the economic characteristics and risks of the embedded derivative are not clearly and closely related to the economic characteristics of the host contract; (2) the hybrid instrument is not remeasured at fair value under otherwise applicable GAAP with changes in fair value reported in earnings as they occur; and (3) a separate instrument with the same terms as the embedded derivative would meet the ASC definition of a derivative and would not be subject to the "derivative scope exception."

7.      Certain contracts involving an entity's own equity qualify for a scope exception

pursuant to ASC 815-40. Specifically, contracts issued or held by an entity that are indexed to the entity's own stock and are classified in stockholders' equity in its statement of financial position. In order for an instrument to be considered indexed to an entity's own stock, its settlement amount must equal the difference between the fair value of a fixed number of the entity's equity shares and a fixed monetary amount or a fixed amount of a debt instrument issued by the entity.

8.      Throughout the Relevant Period, the Individual Defendants issued, or caused the issuance of, statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company maintained materially deficient disclosure controls and internal controls over financial reporting; (ii) there were material weaknesses in the Company's accounting review procedures related to the reporting of certain non-routine, unusual, or complex transactions; (iii) as a result, BigBear improperly determined that the conversion option with the 2026 Convertible Notes was subject to the derivative scope exception under ASI 815-40 and, accordingly; (iv)the Company failed to bifurcate the conversion option in accordance with ASC 815-15; (v) the Company's financial statements contained material misstatements and would require restatement; (vi) BigBear would likely be unable to timely file certain of its required disclosures with the SEC due to the inaccuracy of the Company's financial statements; and (vii) positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis and were, therefore, materially false and misleading at all relevant times.

9.      The truth emerged on March 18, 2025, when the Company announced that it would need to restate its audited consolidated financial statements since fiscal year 2021. The same day, BigBear disclosed that it would be unable to timely file its 2024 annual report (the "2024 10-K") "without unreasonable effort or expense."

10.    On this news, the price of BigBear stock declined 14.9% in one day, from a close of $3.49 per share on March 17, 2025 to a close of $2.97 per share on March 18, 2025.

11.    Then, on March 25, 2025, after the market closed, the Company filed its 2024 10-K, which disclosed that management had "identified a material error in the previously reported financial statements related to its convertible notes issued in December 2021 and due in December 2026." Specifically, the Company revealed that "[t]he conversion option embedded within the 2026 Notes was incorrectly deemed to be eligible for a scope exception from the bifurcation requirements of ASC 815-15 and therefore requires bifurcation as a derivative."

12.    The 2024 10-K further disclosed a material deficiency in BigBear's internal control over financial reporting related to the Company's "reporting and disclosures of certain non-routine, unusual, or complex transactions."

13.    On this news, the price of BigBear stock declined 9.11% in one day, from a close of $3.51 per share on March 25, 2025 to a close of $3.19 per share on March 26, 2025.

14.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, the costs of restating the Company's audited consolidated financial statements since fiscal year 2021, the costs to remediate BigBear's inadequate internal controls over financial reporting, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

15.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding

business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to exercise business judgment to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

<b><u>JURISDICTION AND VENUE</u></b>

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as BigBear maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

21.     Plaintiff is, and has been at all relevant times, a shareholder of BigBear. Plaintiff is a citizen of Pennsylvania.

*Nominal Defendant*

22.     Nominal Defendant BigBear is incorporated under the laws of the State of Delaware.

23.     The Company's principal executive offices are located at 7950 Jones Branch Drive, 1st Floor North Tower, McLean, Virginia, 22102. BigBear's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BBAI."

*Individual Defendants*

24.     Defendant Kevin McAleenan ("McAleenan") has served as the Company's Chief Executive Officer ("CEO") since January 2025. Upon information and belief, Defendant McAleenan is a citizen of Virginia.

25.     Defendant Peter Cannito ("Cannito") has served as Chair of the Board throughout the Relevant Period. According to the Company's public filings, Defendant Cannito received $210,705 in 2022 and $240,558 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Cannito beneficially owned 309,424 shares of BigBear stock, worth roughly $1.8 million.[1] Upon information and belief, Defendant Cannito is a citizen of Virginia.

26.     Defendant Sean Battle ("Battle") has served as a member of the Board throughout the Relevant Period. Defendant Battle previously served as the Company's Chief Strategy Officer.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $5.94 per share closing price of BigBear stock on February 24, 2025.

According to the Company's public filings, Defendant Battle received $94,000 in 2022 and $224,557 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Battle beneficially owned 50,000 shares of BigBear stock, worth $297,000. Upon information and belief, Defendant Battle is a citizen of Florida.

27.     Defendant Pamela Braden ("Braden") has served as a member of the Board throughout the Relevant Period. Defendant Braden served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Braden received $181,972 in 2022 and $225,558 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Braden beneficially owned 457,167 shares of BigBear stock, worth roughly $2.7 million. Upon information and belief, Defendant Braden is a citizen of Washington, D.C.

28.     Defendant Paul Fulchino ("Fulchino") has served as a member of the Board throughout the Relevant Period. Defendant Fulchino served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Fulchino received $180,056 in 2022 and $225,558 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Fulchino beneficially owned 259,692 shares of BigBear stock, worth roughly $1.5 million. Upon information and belief, Defendant Fulchino is a citizen of Florida.

29.     Defendant Jeffrey Hart ("Hart") has served as a member of the Board throughout the Relevant Period. According to the Company's public filings, Defendant Hart received $183,887 in 2022 and $226,556 in 2023 in compensation from the Company. Upon information and belief, Defendant Hart is a citizen of Florida.

30.     Defendant Dorothy D. Hayes ("Hayes") has served as a member of the Board

throughout the Relevant Period. Defendant Hayes served as Chair of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Hayes received $191,549 in 2022 and $130,557 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Hayes beneficially owned 209,401 shares of BigBear stock, worth roughly $1.2 million. Upon information and belief, Defendant Hayes is a citizen of Massachusetts.

31.    Defendant Kirk Konert ("Konert") has served as a member of the Board throughout the Relevant Period. According to the Company's public filings, Defendant Konert received $186,761 in 2022 and $228,057 in 2023 in compensation from the Company. Upon information and belief, Defendant Konert is a citizen of New York.

***Former Director Defendants***

32.    Defendant Amanda Long ("Long") served as the Company's CEO and as a member of the Board from October 2022 until January 2025. According to the Company's public filings, Defendant Long received $4,351,370 in 2022 and $1,938,141 in 2023 in compensation from the Company. As of February 24, 2025, Defendant Long beneficially owned 1,388,763 shares of BigBear stock, worth roughly $8.2 million. Upon information and belief, Defendant Long is a citizen of Illinois.

33.    Defendant Louis R. Brothers ("Brothers") served as the Company's CEO and as a member of the Board from June 2020 until October 2022. According to the Company's public filings, Defendant Brothers received $2,275,238 in 2022 in compensation from the Company. Upon information and belief, Defendant Brothers is a citizen of Virginia.

34.    Defendant Raluca Dinu ("Dinu") served as a member of the Board from December 2021 until March 2024. Defendant Dinu co-founded GigCapital4 and served as a member of the board of directors, President, CEO, and Secretary of GigCapital4 from its inception until the

Merger. According to the Company's public filings, Defendant Dinu received $95,000 in 2022 and $225,557 in 2023 in compensation from the Company. Upon information and belief, Defendant Dinu is a citizen of California.

35.     Defendant Raanan I. Horowitz ("Horowitz") served as a member of the Board from December 2021 until May 2023. According to the Company's public filings, Defendant Horowitz received $181,972 in 2022 in compensation from the Company. Upon information and belief, Defendant Horowitz is a citizen of Texas.

36.     Defendant Avi Katz ("Katz") served as a member of the Board from December 2021 until March 2024. Defendant Katz co-founded GigCapital4 along with Defendant Dinu and served as Executive Chairman of its board of directors from its inception until the Merger. According to the Company's public filings, Defendant received $96,000 in 2022 and $226,557 in 2023 in compensation from the Company. Upon information and belief, Defendant Katz is a citizen of California.

***Officer Defendants***

37.     Defendant Julie A. Peffer ("Peffer") has served as the Company's Chief Financial Officer ("CFO") since June 2022. According to the Company's public filings, Defendant Peffer received $799,580 in 2022 in compensation from the Company. As of February 24, 2025, Defendant Peffer beneficially owned 607,559 shares of BigBear stock, worth roughly $3.6 million. Upon information and belief, Defendant Peffer is a citizen of Texas.

38.     Defendant Joshua Kinley ("Kinley") served as the Company's CFO from December 2020 until June 2022. According to the Company's public filings, Defendant Kinley received $1,093,454 in 2022 in compensation from the Company. Upon information and belief, Defendant Kinley is a citizen of Maryland.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     Because of their positions as officers and/or directors of BigBear, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed BigBear and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

40.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of BigBear and its shareholders.

41.     Each director and officer of the Company owes to BigBear and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of BigBear, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of BigBear, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the adequacy of the Company's internal controls and accounting procedures, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.    To discharge their duties, the officers and directors of BigBear were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of BigBear were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to BigBear's own Code of Conduct and Ethics (the "Code of Conduct");

(b)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how BigBear conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of BigBear and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BigBear's operations would comply with all applicable laws and regulations so that BigBear's financial statements and regulatory filings with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over, and monitor the public statements made by BigBear, the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the problems and prevent its recurrence.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BigBear.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of BigBear and were at all times acting within the course and scope of such agency.

48.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to issue materially inaccurate financial statements, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants,

14

who are directors of BigBear, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BigBear and at all times acted within the course and scope of such agency.

## BIGBEAR'S CODE OF CONDUCT

55.    BigBear's Code of Conduct states that its purpose is to:

[D]eter wrongdoing and promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- accountability for adherence to the Code.

56.    The Code of Conduct applies to "[a]ll directors, officers, and employees" of the

Company, and violations of the Code of Conduct will lead to "disciplinary action . . . including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities."

57.    In a section titled "**HONEST AND ETHICAL CONDUCT**," the Code of Conduct states:

> The Company's policy is to exhibit and promote high standards of integrity by conducting its affairs honestly and ethically, including acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

58.    In a section titled "**CONFLICTS OF INTEREST**," the Code of Conduct states:

> A conflict of interest occurs when an individual's private interest interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

59.    In a section titled "**PROTECTION AND PROPER USE OF COMPANY ASSETS**," the Code of Conduct states that "[a]ll directors, officers and employees should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability and are prohibited."

60.    In a section titled "**COMPLIANCE**," the Code of Conduct states that "[d]irectors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates."

61.    In a section titled "**DISCLOSURE**," the Code of Conduct states:

The Company's periodic reports and other documents filed with the SEC and other regulators, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules, along with other public communications made by the Company.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

- be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

- take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

## **BIGBEAR'S AUDIT COMMITTEE CHARTER**

62.     BigBear's Audit Committee Charter states that the purpose of the Audit Committee is:

[T]o assist the Board with oversight of:

- the integrity of the Company's financial statements;

- compliance with legal and regulatory requirements;

- the Company's independent auditor's qualifications and independence; and

- the performance of the Company's independent auditor and internal audit function.

63.     In a section titled "**Duties and Responsibilities**," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- <u>Audit</u>: To review and discuss with the Company's management and the independent auditor (1) the auditor's responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, planning and staffing, (3) the

scope and timing of the annual audit, (4) any significant risks identified during the independent auditor's risk assessment procedures, (5) the matters required to be discussed by the Public Company Accounting Oversight Board Statement on Auditing Standard No. 1301, as amended, relating to the conduct of the audit and (6) when completed, the results of the annual audit, including significant findings, annual and quarterly financial statements and related disclosures, as well as critical accounting policies and practices used by the Company.

- Audit Problems: To review and discuss with the Company's independent auditor and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditor or internal audit department during their audit work (such as (i) restrictions on the scope of their activities or their access of information, (ii) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise), (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company and (iv) the responsibilities, budget and staffing of the Company's internal audit function), (2) any significant disagreements with management and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's independent auditor or internal audit department and management.

- Critical Audit Matters: To engage in a dialogue with the independent auditor to understand the nature of each identified critical audit matter, the auditor's basis for identifying a matter as a critical audit matter and how each such identified matter will be described in the auditor's report.

- Internal Audit: To review, discuss with the Company's independent auditor, and approve the functions of the Company's internal audit function, including its purpose, authority, organization, responsibilities, budget and staffing, along with updates regarding significant changes thereto; and to review the scope and performance of the function's internal audit plan, including the results of any internal audits and any remedial actions, any reports to management and management's response to those reports or internal audit function; and to review the hiring, dismissal and evaluation of the head of internal audit.

- Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or

other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

- <u>Risk Assessment and Risk Management</u>: Taking into consideration the allocation of responsibility for risk oversight to the other committees of the Board, to review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

- <u>Annual Financials</u>: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in the Company's annual report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board, based on the Audit Committee's review and discussion with management and the independent auditor, whether the audited financial statements should be included in the Company's annual report on Form 10-K.

- <u>Quarterly Financials</u>: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

- <u>Earnings Releases</u>: To review and discuss with management and the Company's independent auditor: the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

- Financial Statements Issues: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles and compliance with legal and regulatory requirements, (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements, (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements, (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles, (5) the completeness and clarity of the disclosures in the financial statements, and (6) each identified critical audit matter, the independent auditor's basis for identifying a matter as a critical audit matter and how such identified matter will be described in the independent auditor's report.

## SUBSTANTIVE ALLEGATIONS

### *Background*

64.    BigBear is a technology company specializing in artificial intelligence and data analytics. The Company provides solutions to enhance decision-making and operational efficiency in various operations, including supply chain management, national security, and biometrics.

65.    In December 2021, BigBear went public via the Merger with GigCapital4, a special purpose acquisition company. Upon completion of the Merger, BigBear issued $200 million of unsecured convertible notes due to mature on December 15, 2026. The 2026 Convertible Notes bear interest at a rate of 6.0% per annum, payable semi-annually, not including any interest payments that are settled with the issuance of shares, and were convertible into 17,391,304 shares of the Company's common stock at an initial Conversion Price of $11.50.

66.    Convertible notes typically constitute long-term debt. Accordingly, pursuant to GAAP, convertible notes are required to be accounted for in quarterly and annual reports as liabilities until they reach maturity, at which point they either convert to equity or are repaid as

principal and interest

67.    BigBear uses the ASC to account "for all transactions and events in which it obtains control over one or more other businesses (even if less than 100% ownership is acquired), to recognize the fair value of all assets and liabilities assumed and to establish the acquisition date fair value as of the measurement date." Accordingly, BigBear was required to account for the Merger, and the accompanying issuance of the 2026 Convertible Notes, in accordance with the ASC.

68.    Pursuant to ASC 815-15, an entity must bifurcate and separately account for a derivative embedded within a host contract (such as the conversion option within the 2026 Convertible Notes) if: (1) the economic characteristics and risks of the embedded derivative are not clearly and closely related to the economic characteristics of the host contract; (2) the hybrid instrument is not remeasured at fair value under otherwise applicable GAAP with changes in fair value reported in earnings as they occur; and (3) a separate instrument with the same terms as the embedded derivative would meet the ASC definition of a derivative and would not be subject to the "derivative scope exception."

69.    Certain contracts involving an entity's own equity qualify for a scope exception pursuant to ASC 815-40. Specifically, contracts issued or held by an entity that are indexed to the entity's own stock and are classified in stockholders' equity in its statement of financial position. In order for an instrument to be considered indexed to an entity's own stock, its settlement amount must equal the difference between the fair value of a fixed number of the entity's equity shares and a fixed monetary amount or a fixed amount of a debt instrument issued by the entity.

70.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make

the statements not misleading because they failed to disclose that: (i) the Company maintained materially deficient disclosure controls and internal controls over financial reporting; (ii) there were material weaknesses in the Company's accounting review procedures related to the reporting of certain non-routine, unusual, or complex transactions; (iii) as a result, BigBear improperly determined that the conversion option with the 2026 Convertible Notes was subject to the derivative scope exception under ASI 815-40; (iv) the Company failed to bifurcate the conversion option in accordance with ASC 815-15; (v) as a result of the foregoing accounting error, the Company's financial statements contained material misstatements and would need to be restated; (vi) due to the inaccuracy of the Company's financial statements, BigBear would likely be unable to timely file certain of its required disclosures with the SEC; and (vii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis and were, therefore, materially false and misleading at all relevant times.

***Materially False and Misleading Statements***

71.     On March 31, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), which was signed by Defendants Kinley, Brothers, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Horowitz, Katz, and Konert. The 2021 10-K stated that "[t]he consolidated financial statements ***have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")***."[2] The 2021 10-K further reported a "[t]otal stockholders' equity (deficit)" of $122,368,000 as of December 31, 2021.

72.     The 2021 10-K stated the following with respect to the Company's disclosure controls and procedures:

> Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls

---

[2] Unless indicated otherwise, all emphasis is added.

and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Annual Report on Form 10-K, and have concluded that, ***based on such evaluation, our disclosure controls and procedures were effective as of December 31, 2021 at the reasonable assurance level to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***, and is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

73.     The 2021 10-K included as exhibits certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Brothers and Kinley, attesting that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

74.     On May 12, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q repeated substantially the same statements that were contained in the 2021 10-K with respect to the adequacy of the Company's disclosure controls and procedures and its adherence to GAAP in the preparation of its financial statements. The 1Q22 10-Q included SOX certifications, signed by Defendants Brothers and Kinley, attesting that "[t]he information contained in the [1Q22 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

75.     On August 12, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2022 (the "2Q22 10-Q"). The 2Q22 10-Q repeated substantially the same statements that were contained in the 2021 10-K with respect to the adequacy of the Company's disclosure controls and procedures and its adherence to GAAP in the preparation of its financial statements. The 2Q22 10-Q included SOX certifications, signed by Defendants Brothers and Kinley, attesting that "[t]he information contained in the [2Q22 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the

Company."

76.    On November 10, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2022 (the "3Q22 10-Q"). The 3Q22 10-Q repeated substantially the same statements that were contained in the 2021 10-K with respect to the adequacy of the Company's disclosure controls and procedures and its  adherence to GAAP in the preparation of its financial statements. The 3Q22 10-Q included SOX certifications, signed by Defendants Brothers and Kinley, attesting that "[t]he information contained in the [3Q22 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

77.    On March 31, 2023, the Company filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Peffer, Long, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Horowitz, Katz, and Konert. The 2022 10-K repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 2022 10-K further reported an amortization of debt issuance costs figure of $2,302,000, a "[d]eferred income tax (benefit) expense" figure of $1,757,000, and a "[n]et increase (decrease) in fair value of derivatives" figure of $1,591,000 on its consolidated statement of cash flows for the year ended December 31, 2022. The 2022 10-K included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

78.    On May 15, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2023 (the "1Q23 10-Q"). The 1Q23 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence

to GAAP in the preparation of its financial statements. The 1Q23 10-Q further reported a derivative liabilities figure of $25,469,000 on its consolidated balance sheet as of March 31, 2023. In addition, for the first quarter of 2023, the 1Q23 10-Q reported an interest expense figure of $3,556,000, a "[n]et increase (decrease) in fair value of derivatives" figure of $10,567,000, and a net loss of $26,214,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $500,000 on its consolidated statement of cash flows. The 1Q23 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [1Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

79.    On August 10, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2023 (the "2Q23 10-Q"). The 2Q23 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 2Q23 10-Q further reported a derivative liabilities figure of $44,126,000 on its consolidated balance sheet as of June 30, 2023. In addition, in its consolidated statement of operations, BigBear reported an interest expense figure of $3,560,000 and a net loss of $16,895,000 for the three months ended June 30, 2023 and an interest expense figure of $7,116,000 and a net loss of $43,109,000 for the six months ended June 30, 2023. The 2Q23 10-Q also reported an amortization of debt issuance costs figure of $1,006,000 and a "[n]et increase (decrease) in fair value of derivatives" figure of $13,688,000 for the six months ended June 30, 2023. The 2Q23 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [2Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

80.     On November 9, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2023 (the "3Q23 10-Q"). The 3Q23 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 3Q23 10-Q further reported a derivative liabilities figure of $28,467,000 on its consolidated balance sheet as of September 30, 2023. In addition, in its consolidated statement of operations, BigBear reported an interest expense figure of $3,540,000 for the three months ended September 30, 2023 and an interest expense figure of $10,656,000 and a net loss of $39,110,000 for the nine months ended September 30, 2023. The 3Q23 10-Q also reported an amortization of debt issuance costs figure of $1,512,000 for the nine months ended September 30, 2023. The 2Q23 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [3Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

81.     On March 7, 2024, the Company issued a press release, announcing its fourth quarter 2024 financial results, which reported an interest expense figure of $3,544,000 and a net loss of $21,256,000 for the quarter.

82.     On March 15, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K"), which was signed by Defendants Peffer, Long, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Katz, and Konert. The 2023 10-K repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 2023 10-K further reported a derivative liabilities figure of $37,862,000 as of December 31, 2023. For the year, the 2023 10-K reported an interest expense figure of $14,200,000 and a net loss of $60,366,000 on its consolidated statement

of operations, and an amortization of debt issuance costs figure of $2,018,000, and a "[d]eferred income tax (benefit) expense" figure of $88,000 on its consolidated statement of cash flows. The 2023 10-K included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

83.    On May 10, 2024, the Company filed a quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2024 (the "1Q24 10-Q"). The 1Q24 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 1Q24 10-Q further reported a derivative liabilities figure of $24,956,000 and a "[t]otal stockholders' equity (deficit)" figure of $108,482,000 on its consolidated balance sheet as of March 31, 2024. In addition, for the first quarter of 2024, the 1Q24 10-Q reported an interest expense figure of $3,555,000 and a net loss of $125,147,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $506,000 on its consolidated statement of cash flows. The 1Q24 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [1Q24 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

84.    On August 9, 2024, the Company filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2024 (the "2Q24 10-Q"). The 2Q24 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 2Q24 10-Q further reported a derivative liabilities figure of $17,074,000 and a "[t]otal stockholders' equity (deficit)" figure of $102,756,000 on its consolidated balance sheet as of June 30, 2024. In addition,

the 2Q24 10-Q reported an interest expense figure of $3,551,000 for the quarter and $7,106,000 for the six months ended June 30, 2024, a "[n]et increase (decrease) in fair value of derivatives" figure of $7,882,000 for the quarter, and a net loss of $11,737,000 for the quarter and $136,884,000 for the six months ended June 30, 2024. The 2Q24 10-Q also reported an amortization of debt issuance costs figure of $1,012,000 for the six months ended June 30, 2024. The 2Q24 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [2Q24 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

85.   On November 7, 2024, the Company filed a quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2024 (the "3Q24 10-Q"). The 3Q24 10-Q repeated substantially the same statement that was contained in the 2021 10-K with respect to the Company's adherence to GAAP in the preparation of its financial statements. The 3Q24 10-Q further reported a derivative liabilities figure of $15,796,000 and a "[t]otal stockholders' equity (deficit)" figure of $98,433,000 on its consolidated balance sheet as of September 30, 2024. In addition, for the nine months ended September 30, 2024, the 3Q24 10-Q reported an interest expense figure of $10,647,000 and a net loss of $149,060,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $1,517,000 on its consolidated statement of cash flows. The 3Q24 10-Q included SOX certifications, signed by Defendants Long and Peffer, attesting that "[t]he information contained in the [3Q24 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

86.   The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company maintained materially deficient disclosure controls and internal

controls over financial reporting; (ii) there were material weaknesses in the Company's accounting review procedures related to the reporting of certain non-routine, unusual, or complex transactions; (iii) BigBear improperly determined that the conversion option with the 2026 Convertible Notes was subject to the derivative scope exception under ASI 815-40; (iv) accordingly, the Company failed to bifurcate the conversion option in accordance with ASC 815-15; (v) the Company's financial statements contained material misstatements and would need to be restated; (vi) due to the inaccuracy of the Company's financial statements, BigBear would likely be unable to timely file certain of its required disclosures with the SEC; and (vii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects lacked a reasonable basis and were, therefore, materially false misleading at all relevant times.

***The Truth Emerges***

87.    On March 18, 2025, the Company filed a current report on Form 8-K with the SEC, disclosing that certain of its financial statements since fiscal year 2021 should no longer be relied upon and would be restated. Specifically, the Company stated:

> On March 17, 2025, the Company's Board of Directors (the "Board"), after discussion with the Audit Committee of the Board (the "Audit Committee") and with management of the Company and, following the Company's dialogue with the Company's independent registered public accounting firm, Grant Thornton LLP ("Grant Thornton"), concluded that the Company will need to restate its audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and in 2024 (collectively, the "Prior Financial Statements") and that the Prior Financial Statements, as well as the Company's audited consolidated financial statements for the fiscal year ended December 31, 2021, should no longer be relied upon for the reasons described below.

> In connection with the financial statements to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Financial Statements") and, as part of the review of the accounting treatment of the Company's convertible secured notes issued in December 2024 (the "2029 Notes"), the Company, together with Grant Thornton LLP ("Grant Thornton"), the Company's independent auditors, reevaluated the accounting presentation of the

Company's convertible notes due in 2026 (the "2026 Notes"), specifically, the accounting for the embedded conversion option. The Company and Grant Thornton had previously concluded that the embedded conversion option did not need to be accounted for as a derivative separate from the 2026 Notes, which was consistently reflected across all of the Company's historical financial statements. The Company requires additional time to complete valuations necessary to determine the impact on the Company's historical financial statements and to disclose the impact reflective of this change as of and for the fiscal year ended December 31, 2024. In addition, the change in position on the interpretation and application of the accounting guidance will also result in the Company's restatement of the Prior Financial Statements.

88.     The same day, the Company disclosed that it would be unable to timely file its 2024 10-K "without unreasonable effort or expense."

89.     On this news, the price of BigBear stock declined 14.9% in one day, from a close of $3.49 per share on March 17, 2025 to a close of $2.97 per share on March 18, 2025.

90.     Then, on March 25, 2025, after the market closed, the Company filed its 2024 10-K, which stated, in pertinent part:

[F]or the period ended December 31, 2024, management identified a material error in the previously reported financial statements related to its convertible notes issued in December 2021 and due in December 2026 ("2026 Notes"). The conversion option embedded within the 2026 Notes was incorrectly deemed to be eligible for a scope exception from the bifurcation requirements of ASC 815-15 and therefore requires bifurcation as a derivative ("2026 Notes Conversion Option"). The 2026 Notes include certain adjustments to the conversion rate that violate the "fixed-for-fixed" criteria described in Accounting Standards Codification ("ASC") 815-40. As a result, the consolidated financial statements have been restated to reflect the issuance of the 2026 Notes Conversion Option at fair value as of December 7, 2021 and the subsequent remeasurement to fair value at each reporting date.

91.     The 2024 10-K additionally provided an overview of the Company's restatement of its previously issued financial statements, which included the following adjustments:

| Period | Item | Previously Reported Figure | Restated Figure |
|--------|------|----------------------------|-----------------|
| As of December 31, 2021 | Total Stockholders' Equity | $122,368,000 | $159,688,000 |
| | | | |
| Year Ended | Amortization of Debt | $2,302,000 | $11,958,000 |

| December 31, 2021 | Issuance Costs and Discount | | |
|---|---|---|---|
| | Deferred Income Tax (Benefit) Expense | $1,757,000 | $1,924,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $1,591,000 | $21,387,000 |
| | | | |
| As of March 31, 2023 | Derivative Liabilities | $25,469,000 | $28,469,000 |
| | | | |
| Three Months Ended March 31, 2023 | Interest Expense | $3,556,000 | $6,084,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $10,567,000 | $13,012,000 |
| | Net Loss | $26,214,000 | $31,187,000 |
| | Amortization of Debt Issuance Costs and Discount | $500,000 | $3,028,000 |
| | | | |
| As of June 30, 2023 | Derivative Liabilities | $44,126,000 | $46,435,000 |
| | | | |
| Three Months Ended June 30, 2023 | Interest Expense | $3,560,000 | $6,186,000 |
| | Net Loss | $16,895,000 | $18,830,000 |
| | | | |
| Six Months Ended June 30, 2023 | Interest Expense | $7,116,000 | $12,270,000 |
| | Net Loss | $43,109,000 | $50,017,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,006,000 | $6,160,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $13,688,000 | $15,442,000 |
| | | | |
| As of September 30, 2023 | Derivative Liabilities | $28,467,000 | $29,166,000 |
| | | | |
| Three Months Ended September 30, 2023 | Interest Expense | $3,540,000 | $6,267,000 |
| | | | |
| Nine Months Ended September 30, 2023 | Interest Expense | $10,656,000 | $18,537,000 |
| | Net Loss | $39,110,000 | $47,135,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,512,000 | $9,393,000 |
| | | | |
| Three Months | Interest Expense | $3,544,000 | $6,340,000 |

| | | | |
|---|---|---|---|
| Ended December 31, 2023 | Net Loss | $21,256,000 | $23,522,000 |
| | | | |
| As of December 31, 2023 | Derivative Liabilities | $37,862,000 | $38,353,000 |
| | | | |
| Year Ended December 31, 2023 | Interest Expense | $14,200,000 | $24,877,000 |
| | Net Loss | $60,366,000 | $70,657,000 |
| | Amortization of Debt Issuance Costs and Discount | $2,018,000 | $12,695,000 |
| | Deferred Income Tax (Benefit) Expense | $88,000 | $235,000 |
| | | | |
| As of March 31, 2024 | Derivative Liabilities | $24,956,000 | $25,262,000 |
| | Total Stockholders' Equity (Deficit) | $108,482,000 | $143,173,000 |
| | | | |
| Three Months Ended March 31, 2024 | Interest Expense | $3,555,000 | $6,385,000 |
| | Net Loss | $125,147,000 | $127,792,000 |
| | Amortization of Debt Issuance Costs and Discount | $506,000 | $3,336,000 |
| | | | |
| As of June 30, 2024 | Derivative Liabilities | $17,074,000 | $17,181,000 |
| | Total Stockholders' Equity (Deficit) | $102,756,000 | $134,745,000 |
| | | | |
| Three Months Ended June 30, 2024 | Interest Expense | $3,551,000 | $6,452,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $7,882,000 | $8,081,000 |
| | Net Loss | $11,737,000 | $14,439,000 |
| | | | |
| Six Months Ended June 30, 2024 | Interest Expense | $7,106,000 | $12,837,000 |
| | Net Loss | $136,884,000 | $142,231,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,012,000 | $6,743,000 |
| | | | |
| As of September 30, 2024 | Derivative Liabilities | $15,796,000 | $15,851,000 |
| | Total Stockholders' Equity (Deficit) | $98,433,000 | $127,463,000 |
| | | | |
| Nine Months Ended September 30, 2024 | Interest Expense | $10,647,000 | $19,389,000 |
| | Net Loss | $149,060,000 | $157,366,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,517,000 | $10,259,000 |

92.     In addition to the above disclosures, the 2024 10-K stated the following with respect to the Company's internal control over financial reporting:

*Material Weakness in Internal Control over Financial Reporting*

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis. In connection with the Company's evaluation of internal control over financial reporting for the year ended December 31, 2024, the following material weakness was identified:

- ***We have not consistently executed our technical accounting review policies, inclusive of the application of certain interpretations subject to significant judgement or differences in interpretation, at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions.***

The material weakness described above did not result in a material misstatement to the consolidated financial statements as of December 31, 2024 and the year then ended presented in this Annual Report on Form 10-K; however, the material weakness did result in a material misstatement to the consolidated financial statements as of and for the years ended December 31, 2023 and December 31, 2022, and as of and for the interim quarterly periods during the years ended December 31, 2024 and 2023 presented in this Annual Report on Form 10-K and labeled as restated.

93.     On this news, the price of BigBear stock declined 9.11% in one day, from a close of $3.51 per share on March 25, 2025 to a close of $3.19 per share on March 26, 2025.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

95.     BigBear is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

33

96.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

97.     Plaintiff is an owner of BigBear stock and has been a continuous holder of the Company's common shares at all relevant times.

98.     At the time this action was commenced, the eight-member Board was comprised of Defendants Cannito, Battle, Braden, Fulchino, Hart, Hayes, Konert, and McAleenan. Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

99.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

100.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual

34

Defendants knew, or in the exercise of adequate diligence, should have known, of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

101.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's financial condition and the material events giving rise to these claims. Specifically, as Board members of BigBear, the Individual Defendants knew, or should have known, the material facts surrounding the Company's deficient accounting review procedures and inadequate internal controls over financial reporting.

102.    Defendant McAleenan is not disinterested or independent and is, therefore, incapable of considering a demand. In addition to his service as a member of the Board, Defendant McAleenan serves as the Company's CEO. Further, Defendant McAleenan is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

103.    Defendants Cannito, Hart, Konert, Fulchino and Braden are not disinterested or independent due to their close and longstanding business relationships. In addition to their service on the Board of BigBear, Defendants Cannito, Hart, Konert, Fulchino and Braden are each affiliated with AE Industrial Partners, LP ("AE Industrial"), a private investment firm and the majority shareholder of BigBear. Specifically, Defendant Cannito has served as AE Industrial's Operating Partner since June 2019. Defendant Hart joined AE Industrial as an Associate in 2015 and became Principal in October 2020. Defendant Konert serves as AE Industrial's Managing

Partner. Defendant Fulchino has served as AE Industrial's Operating Partner since June 2015, and Defendant Braden has served as AE Industrial's Operating Partner since 2022. Further, Defendants Cannito, Hart, and Konert each serve or have served on the board of Redwire Space, Inc., a space solutions company in AE Industrial's portfolio. Accordingly, Defendants Cannito, Hart, Konert, Fulchino and Braden cannot independently consider any demand to sue one another.

104.    Defendants Braden, Fulchino, and Hayes served as members of the Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Braden, Fulchino, and Hayes cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

105.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of BigBear stock and stock options they held.

106.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to BigBear's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in issuing and/or causing the Company to issue the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

107.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the misconduct alleged herein. For instance, none of the Board's current members have sought to enforce BigBear's Clawback Policy which provides for "the recoupment of certain executive compensation in the event that the Company is required to prepare an accounting restatement of its financial statements due to material noncompliance with any financial reporting requirement under the federal securities laws."

108.    The Individual Defendants' misconduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein.

They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company. Accordingly, demand is excused as being futile.

109.    The acts complained of herein constitute violations of fiduciary duties owed by BigBear's officers and directors, and these acts are incapable of ratification.

110.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e*., monies belonging to the stockholders of BigBear. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of BigBear, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

111.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause BigBear to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

112.    Accordingly, for all of the reasons set forth above, all of the current directors cannot

consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for
### Breach of Fiduciary Duties

113. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

115. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

116. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements, including materially false and misleading financial statements, to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, incurring substantial costs to restate the Company's audited consolidated financial statements since fiscal year 2021, costs to remediate BigBear's inadequate internal controls over financial reporting, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

118.    Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

121.    Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BigBear.

124.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from BigBear that was tied to their performance or to the artificially inflated valuation of BigBear.

125.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

126.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

127.    Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### for Waste of Corporate Assets

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of BigBear's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

130.    As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, among other things, causing BigBear to incur and pay defense costs in connection with the Securities Class Action, incur and pay substantial costs to restate the Company's audited consolidated financial statements since fiscal year 2021, incur and pay costs to remediate the Company's inadequate internal controls over financial reporting, and approving performance-based compensation linked to the Company's perceived successes.

131.    The Individual Defendants further wasted corporate assets by failing to enforce BigBear's Clawback Policy which provides for "the recoupment of certain executive compensation in the event that the Company is required to prepare an accounting restatement of its financial statements due to material noncompliance with any financial reporting requirement under the federal securities laws."

132.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133.    Plaintiff on behalf BigBear has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 24, 2025                    **SPIRO & BROWNE, PLC**

                                 By:  */s/ David G. Browne*
                                      David G. Browne (VSB No. 65306)
                                      Spiro & Browne PLC
                                      2400 Old Brick Road
                                      Glen Allen, VA 23060
                                      Telephone: (804) 573-9220
                                      Email: dbrowne@sblawva.com

                                      *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com